Michael W. Sobol (SBN 19485)
msobol@lchb.com
Michael K. Sheen (SBN 288284)
msheen@lchb.com
Amelia A. Haselkorn (SBN 339633)
ahaselkorn@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

Douglas I. Cuthbertson (*pro hac vice* forthcoming)
dcuthbertson@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500
Facsimile:  212.355.9592

*Attorneys for Plaintiff and the Proposed Classes*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRANDON HENDERSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No.  3:25-cv-5589<br><br>**COMPLAINT**<br><br>**CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

Plaintiff Brandon Henderson ("Plaintiff"), individually and on behalf of a Class of all other similarly situated persons, brings this action against Meta Platforms, Inc. ("Meta" or "Defendant") for violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1), et seq. ("ECPA"); violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 631, 632, 635, and 638.51 ("CIPA"); violation of California's Constitutional Right to Privacy; unlawful intrusion upon seclusion; and unjust enrichment.

**NATURE OF THE ACTION**

1. Across wide swaths of the internet, Meta employs hidden tracking code, including software known as the Meta Pixel ("Meta Pixel" or "Pixel"), which sends to Meta time-stamped, personally identifiable records of individuals' personal information, including their activities on and communications with websites. Through the Pixel's surveillance, Meta obtains vast quantities of protected data on a daily basis from across the internet. Typically, for example, when an individual logs into their Facebook or Instagram account through their web browser, Meta can associate the personal browsing-related information it collects from the individual's interactions with other websites with their Facebook or Instagram profile information (e.g., names, email addresses, contact information). This happens often without the individual's knowledge or consent.

2. More recently, however, through the violation of widely accepted internet protocols, Meta has expanded the use of its Pixel well beyond the scope of what was previously known to the public or that a reasonable person would even expect possible.[1] From September 2024 through at least June 2, 2025, Meta purposefully circumvented internet protocols to associate users' personal browsing-related information with their Facebook or Instagram profiles and associated IDs, not only when logged into those accounts *through their browser*, but also on Android devices *through the Facebook or Instagram apps*.

3. Specifically, Meta abused a basic functionality built into modern web browsers—so-called "localhost" ports—that allow communications between browsers and other apps. In a typical mobile environment, localhost ports allow web browsers to send data through the Android operating system to establish services, including media connections (e.g., audio and video calls), file sharing, and developer

---

[1] Dan Goodin, ArsTechnica, *Meta And Yandex Are De-Anonymizing Android Users' Web Browsing Identifiers* (June 3, 2025), https://arstechnica.com/security/2025/06/meta-and-yandex-are-de- anonymizing-android-users-web-browsing-identifiers/.

CLASS ACTION COMPLAINT

debugging. Because localhost ports are used to facilitate routine functions on a mobile device, web browsers access these ports without notification to their users.

4.    Rather than use localhost ports for these intended purposes, however, Meta surreptitiously exploited the localhost ports in the Android operating system environment to pass data between web browsers and Meta's own apps (Facebook and Instagram), allowing Meta unfettered access to an individual's browsing activity. Indeed, over time, Meta deliberately changed the specific methods used to share user browsing information between browsers and Meta's apps—by changing the protocol or format by which such data was packaged, and by using different ports—to conceal Meta's true purposes. This scheme enabled Meta to tie the individual's personal browsing-related information to their Facebook and Instagram profiles, *even when that individual did not log into Facebook or Instagram on their browser*, rendering such browsing-related information completely non-anonymous and identifiable. Worse yet, this method of tracking bypassed more common user-initiated privacy protections such as use of "incognito mode" and clearing cookies.

5.    Meta's conduct violates a fundamental principle of modern internet security called "sandboxing." In the Android operating system and elsewhere, apps are designed to function within a "sandbox" such that application code is executed within a restricted environment with limited contact to the external environment—much like a physical sandbox at a playground. Thus, when code (like the Meta Pixel) is configured to run on a web browser, it is not expected to be able to obtain user data from, or transmit user data to, applications outside of the web browser. But that is precisely what happened: Meta modified the code for the Pixel as well as its apps (Facebook and Instagram) to give it unauthorized access to individuals' browsing-related information and to associate that information with Facebook and Instagram profile information it already had. Meta's behavior was so brazen and inappropriate that a Google representative recently responded that Meta was "using capabilities present in many browsers across . . . Android in unintended ways that blatantly violate our security and privacy principles."[2] Indeed, upon learning of Meta's exploitation of the localhost communication channel, web browser developers like Mozilla and DuckDuckGo immediately attempted to mitigate Meta's behavior in an effort to protect their own users' privacy. And shortly after Meta's misconduct was publicly revealed, the company announced it

---

[2] *Meta And Yandex Are De-Anonymizing Android Users' Web Browsing Identifiers*, *supra* n.1.

would immediately "pause" this unlawful collection of personal information.[3] It has offered no further comment about the situation, including any explanation for why it purposely implemented this tracking mechanism or what it would do or has done with the voluminous data it has already collected to date.

6.      Plaintiff is an Android user with a Facebook account who, like other class members, was affected by Meta's surreptitious tracking practices. Plaintiff now brings this action to enforce his privacy rights and to seek damages for the harm Meta caused him and others by the collection and sale of his personal information.

## PARTIES

7.      Plaintiff Brandon Henderson is a resident of Los Angeles, Los Angeles County, California.

8.      Defendant Meta Platforms, Inc. is a Delaware corporation with its headquarters in Menlo Park, San Mateo County, California.

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over Meta because it is incorporated and has its principal place of business within the Northern District of California.

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises from violations of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1), et seq. ("ECPA").  This Court may also exercise supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a), because they are so related to the ECPA claims (within the Court's original jurisdiction) that they form part of the same case or controversy under Article III of the United States Constitution. This case does not present novel or complex issues of state law that predominate over claims for which this Court has original jurisdiction, and there are no compelling reasons for declining supplemental jurisdiction over those of Plaintiff's claims that do not arise under the ECPA.

11.     This Court also has subject matter jurisdiction over all claims pleaded herein pursuant to 28 U.S.C. § 1332(d)(2) because it is a class action where the aggregate amount in controversy is in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from Meta.

---

[3] *Id.*

CLASS ACTION COMPLAINT

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Meta resides in this District.

## COMMON FACTUAL ALLEGATIONS

**I.      Meta and the Meta Pixel**

13.     **The Meta Platform**. Meta is an advertising company that sells advertising space on the social media platforms it operates. Meta's advertising is based on sophisticated categorizing and targeting capabilities that are fueled by the personal data of users of the social media platform and other internet users.[4] Meta's targeting abilities are exceptional because Meta surveils users' online activities, both on and off Meta's own websites and apps.[5] This expansive tracking enables Meta to make highly personal inferences about users, such as about their "interests," "behavior," "gender," and "location."[6] Meta compiles information it obtains and infers about internet users and uses it to identify personalized "audiences" likely to respond to particular advertisers' messaging. Access to such audiences is extremely valuable to Meta's advertising clients. In 2021, Meta generated approximately $114.93 billion, nearly 98% of its revenue, through advertising.

14.     **The Meta Pixel**. The Meta Pixel, originally called the Facebook Pixel, was first introduced in 2015.[7] It is a primary means through which Meta acquires personal information to create customized audiences for its advertising business. Meta's public-facing descriptions characterize the Pixel as a simple "snippet of JavaScript code" that helps website owners keep track of user activity on their websites, obscuring the Pixel's fundamental purpose to collect personal information and track behavior to fuel its advertising business.[8] Meta emphasizes that website managers can set up a Pixel easily, without any help

[4] Meta Business Help Center, *Why advertise on Facebook, Instagram and other Meta technologies*, https://www.facebook.com/business/help/205029060038706.

[5] Meta Business Help Center, *About Meta Pixel*, https://www.facebook.com/business/help/742478679120153?id=1205376682832142; Meta, *Facebook Core Audience Targeting*, https://www.facebook.com/business/news/Core-Audiences.

[6] Meta, *Ad Targeting: Help your ads find the people who will love your business*, https://www.facebook.com/business/ads/ad-targeting.

[7] Cecile Ho, Meta, *Announcing Facebook Pixel* (Oct. 14, 2015), https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

[8] Meta for Developers, *Meta Pixel*, https://developers.facebook.com/docs/meta-pixel/; Meta, *Retargeting: Inspire People to Rediscover What They Love About Your Business*, https://www.facebook.com/business/goals/retargeting (Meta Pixel "tracks the people [who visit your website] and the type of actions they take.")

from their web developer. "You only need to place a single pixel across your entire website."[9] As of 2022, the Pixel had been installed on an estimated 30 percent of popular internet websites.[10]

15. The Meta Pixel sends Meta volumes of information about each visit to each website where it is embedded. Regardless of the purpose a website owner may have (if any) for allowing the Meta Pixel to function on its webpages, the code is configured to capture a substantial amount of information by default. Since 2015 when it was introduced, the Pixel has transmitted HTTP header information, including the URL of each page visited on a website, by default. In 2017, Meta quietly modified the Pixel code to transmit additional information automatically, including "microdata" (details about the website and substance of what it offers), other "contextual information" (including details about the structure of a particular webpage), and "SubscribedButtonClick" information (details about buttons available to click on each page including the text), which fires each time a user clicks on a hyperlink or button on the webpage.[11] Meta made these changes to learn more about website users for advertising purposes. Since 2017, the Pixel has been configured to gather all such information indiscriminately and by default without intervention from the website owner requesting the information be tracked.

16. In 2018, Meta again modified the default operation of the Pixel to maximize the private information it transmits. Meta introduced a "first-party cookie option" for the Pixel, to circumvent improvements in how web browsers block third-party cookies (a primary means by which Facebook historically tracked people across the web). Being embedded in websites as a first-party cookie, rather than as a third-party cookie, causes users' browsers to treat that Pixel as though it is offered by the website they are visiting, rather than by Meta, a third party. When the Pixel is embedded in a website as a first-party cookie, the third-party cookie blocking functions of modern web browsers do not inhibit the Meta Pixel's

---

[9] *Announcing Facebook Pixel*, *supra* n.7.

[10] Surya Mattu et al., The Markup, *How We Built a Meta Pixel Inspector* (Apr. 28, 2022), https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector ("Blacklight, our real-time web privacy inspector, found that more than 30 percent of popular websites embed the Meta Pixel.").

[11] PixelYourSite, *Automatic Facebook Pixel Events*, https://www.pixelyoursite.com/major-facebook-pixel-update-automatic-facebook-pixel-events; Carey-Simon, George, WeRSM, *Facebook Pixel is about to Get a Bit Smarter* (Apr. 28, 2017), https://wersm.com/facebook-pixel-get-little-smarter/.

collection of data. Operating similarly to, and with the same privacy exemptions applicable to, a first-party cookie became another default Pixel setting in or around October 2018.[12]

17.    In short, circumventing privacy measures designed to protect users' information, the Meta Pixel consistently captures HTTP headers, Pixel-specific data, and Button Click data on every visit to every website through its default operation. Meta acknowledges that the Pixel is configured to collect this information, and can collect the following non-exhaustive categories of information from the webpages where it is embedded:

**Http Headers** – Anything that is generally present in HTTP headers, a standard web protocol sent between any browser request and any server on the internet. This information may include data like IP addresses, information about the web browser, page location, document, referrer and person using the website.

**Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.

**Button Click Data** – Includes any buttons clicked by site visitors, the labels of those buttons and any pages visited as a result of the button clicks.

**Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.

**Form Field Names** – Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[13]

18.    In all websites where the Pixel operates, when a user exchanges information with the host of that site, Meta's software script surreptitiously directs the user's browser to send a separate message to Meta's servers. This second, secret transmission contains the original request sent to the host website (the "GET request"), along with additional data that the Pixel is configured to collect (the "POST request").[14] GET and POST requests are communications that contain contents from both the user and from servers

---

[12] Sergiu Gatlan, Softpedia News, *Facebook to Circumvent Cross-Site Tracking Block with New First-Party Cookie* (Oct. 6, 2018), https://news.softpedia.com/news/facebook-to-circumvent- cross-site-tracking-block-with-new-first-party-cookie-523089.shtml.

[13] *Meta Pixel*, *supra* n.8; *see also* Meta for Developers, *Meta Pixel: Advanced*, https://developers.facebook.com/docs/facebook-pixel/advanced/; Meta Business Help Center, *Best practices for Meta Pixel setup*, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; Meta for Developers, *App Events API*, https://developers.facebook.com/docs/marketing-api/app-event-api/; Meta for Developers, *Meta Pixel: Get Started*, https://developers.facebook.com/docs/meta-pixel/get-started.

[14] *How We Built a Meta Pixel Inspector, supra*, n.10.

CLASS ACTION COMPLAINT

associated with the website they are visiting. These transmissions are initiated by Meta code and concurrent with the communications to and from the host website.

19. Meta associates the information it obtains via the Meta Pixel with other information regarding the user, using personal identifiers that are transmitted concurrently with other personal information the Pixel is configured to collect. For Facebook account holders who have logged in through their browsers, these identifiers include the "c_user" IDs, which allow Meta to link data to a particular Facebook account, and "xs" cookies associated with a browsing session. For both Facebook account holders and users who do not have a Facebook account, these identifiers also include cookies that Meta ties to their browser, such as "datr" and "fr" cookies.[15]

## II.   Meta Abuses Android's Internal Networking Protocols to Collect De-Anonymized Browsing Information

### A.   Collection of Information Through the Meta Pixel

20. As alleged above, when a user visits a webpage on which the Meta Pixel is installed (via a web browser), the Meta Pixel will direct the transmission of certain types of browsing information to Meta's servers including, for example, the URL of the webpage visited, the information the user searched for in a search bar, and actions the user took on a webpage.

21. This information is paired with information regarding the user, using cookies that Meta stores on the user's device. A cookie is a "small text file (up to 4KB) created by a website that is stored in the user's computer either temporarily for that session only or permanently in storage (persistent cookie)."[16] Among other things, persistent cookies can be used to "track user behavior across different sites. They store information such as geographic location, device specifications, and specific actions taken on the website."[17]

22. Meta "place[s] cookies on [a person's] computer or device and receive[s] information stored in [those] cookies when [said person] use[s] or visit[s]: [] Meta Products [(i.e., Facebook, Messenger, Instagram, etc.)]; [and] Products provided by other members of the Meta Companies; and Websites and

---

[15] Meta, *Cookies Policy* (Dec. 12, 2023), https://www.facebook.com/policy/cookies.

[16] PC Magazine, *Cookie*, https://www.pcmag.com/encyclopedia/term/cookie.

[17] Cookiebot, *What Are Tracking Cookies and How Do They Work?* (Dec. 28, 2023), https://www.cookiebot.com/en/tracking-cookies/.

CLASS ACTION COMPLAINT

apps provided by other companies that use the Meta Products, including companies that incorporate Meta technologies [(i.e., the Facebook Business Tools)] into their websites and apps."[18]

23. In short, the Meta Pixel places cookies on a user's device that allows Meta to follow a user's surfing behavior across other websites which have implemented a Meta Pixel or other Meta technology.[19]

24. When a user visits a website while logged into Facebook using the same browser, the Meta Pixel will compel that user's browser to transmit several cookies, including the c_user, datr, fr, and _fbp[20] cookies.

25. The c_user cookie contains, at least, the user's unencrypted Facebook ID.[21] The c_user cookie has a lifespan of three hundred sixty-five days.[22]

26. The datr cookie contains, at least, a value that uniquely identifies a browser.[23] The datr cookie has a lifespan of four hundred days.[24]

27. The fr cookie contains, at least, a value that uniquely identifies a browser and the user's encrypted Facebook ID.[25] The fr has a lifespan of ninety days.[26]

---

[18] Facebook, *Cookies Policy*, https://www.facebook.com/policy/cookies/.

[19] *See, e.g.*, Paschalis Bekos et al., *The Hitchhiker's Guide to Facebook Web Tracking with Invisible Pixels and Click IDs* (Apr. 2023), *available at* https://www.researchgate.net/publication/370413406 ("FB Pixel[ is] a conversion tracking tool embedded via JavaScript on websites, and be used to track users' activities both in space (i.e., in websites utilizing FB Pixel), and in time (i.e., in the past and future). Although FB Pixel advertises a 3-month-long lifespan and can seemingly limit any tracking to at most 3 months, unfortunately, in a great majority of websites with FB Pixel, the pixel employs rolling expiration dates for the f[i]rst-party cookies it places (_fbp), which can postpone its lifespan (and its associated tracking) indef[i]nitely.") (cleaned up).

[20] Note, the Meta Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, the Website. PC Magazine, *First-Party Cookie*, https://www.pcmag.com/encyclopedia/term/first-party-cookie. A third-party cookie is "created by a different website than the one the user is currently visiting"—*i.e.*, Facebook. PC Magazine, *Third-Party Cookie*, https://www.pcmag.com/encyclopedia/term/third-party-cookie. The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook. Pictured here and in the *infra* two images is the _fbp cookie, sent as a first-party cookie.

[21] Microsoft, *Cookie Compliance*, https://learn.microsoft.com/en- us/dynamics365/commerce/cookie-compliance ("Cookie[:] c_user. Description[:] Cookie contains the user ID of the currently signed-in user.").

[22] Facebook, *Cookies Policy*, https://www.facebook.com/policy/cookies/.

[23] *Id.* ("'Datr' is a unique identifier for your browser.").

[24] *Id.*

[25] Data Protection Commissioner, *Facebook Ireland Ltd, Report of Re-Audit* (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf ("The first part of the cookie is a browser ID, used to identify the web browser. The second part of the cookie is an encrypted version of the logged in user's Facebook ID.").

[26] Facebook, *Cookies Policy*, https://www.facebook.com/policy/cookies/.

CLASS ACTION COMPLAINT

28.    The _fbp cookie "identifies browsers for the purposes of providing advertising and site analytics services and has a lifespan of 90 days."[27]

29.    When a user visits a website using a browser that has recently logged out of the user's Facebook account, Meta compels the visitor's browser to send a smaller set of cookies, including the datr, fr, and _fbp cookies.

30.    Typically, Meta is only able to use the c_user, datr, fr, and _fbp cookies stored by a web browser to associate the user's Facebook-specific information (e.g., Facebook ID and data related to the user's Facebook profile) with the user's browsing activity as a means to identify the user.[28] As Meta itself acknowledges, certain "customer information parameters" or event data obtained from the users' website visits are ultimately "matched to Meta accounts."[29] In this way, the "cookie[s] identif[y] browsers for the purposes of providing advertising and site analytics services."[30] Accordingly, Meta's cookies are used to pair event data with personally identifiable information so Meta can later retarget the same person on Facebook or elsewhere.

**B.    Meta Ties Android Users' Browsing Information to Their Facebook or Instagram Profiles, Rendering Android Users Non-Anonymous and Identifiable**

31.    Beginning in at least September 2024 and continuing through at least June 2, 2025, Defendant "abus[ed] legitimate Internet protocols [and platform capabilities], causing Chrome and other browsers [on Android mobile phones] to surreptitiously send unique identifiers to native apps installed on a device."[31]

32.    Typically, mobile applications operate in "sandboxes." "By default, apps can't interact with each other and have limited access to the [operating system]. If app A tries to do something malicious, such as read app B's data or dial the phone without permission, it's prevented from doing so because it doesn't have the appropriate default user privileges."[32] By way of illustration, one app installed on an Android

---

[27] Facebook, *Cookies Policy*, https://www.facebook.com/privacy/policies/cookies/.

[28] *Id*.

[29] Facebook, *About Event Match Quality*, https://www.facebook.com/business/help/765081237991954.

[30] Facebook, *Cookies Policy*, https://www.facebook.com/policy/cookies.

[31] *Id*.

[32] Android Open Source Project, *Application Sandbox*, https://source.android.com/docs/security/app-sandbox.

CLASS ACTION COMPLAINT

device (like the Facebook or Instagram app) is not supposed to be able to access data stored by another app (like a web browser), and vice versa. "You run everything in a sandbox, and there is no interaction within different elements running on it."[33] This "cut[s] off access to sensitive data or privileged system resources."[34]

33. As detailed in a recent study, Meta broke the mobile sandboxes that isolate data as between web browsers and Meta's social media apps for Facebook and Instagram. This abuse allowed Meta to "bypass core security and privacy protections provided by both the Android operating system and browsers that run on it," and to "pass cookies or other identifiers from [websites with the Meta Pixel loaded on] Firefox and Chromium-based browsers to native Android apps for Facebook [and] Instagram," tying "that vast browsing history to the account holder logged into the app."[35]

34. Specifically, when an Android user accessed a website on their mobile device where the Meta Pixel is installed—and if the Android user was logged into the Facebook or Instagram app installed on her device—Meta abused localhost communication ports intended to be "used for legitimate purposes such as web development"[36] to share the fbp values generated on the web browser. Meta used the fbp values to tie browsing information with the native apps where users are logged in, hence persistently and "effectively de-anonymizing users' browsing habits on sites containing these trackers."[37]

35. When connecting two or more computing devices to share information between them (the process known as computer networking), the term "localhost" refers to the current device. In other words, a device's (or computer's) localhost address is shorthand used by that device to refer to specific applications or services running on that device, with each application or service using one or more localhost "ports." For example, localhost:80 is the commonly used default port for unsecured web traffic (HTTP), while localhost:443 is the commonly used default port for secure web traffic (HTTPS). Different applications may use different ports for communication purposes.

---

[33] *Meta And Yandex Are De-Anonymizing Android Users' Web Browsing Identifiers*, *supra*, n.1.
[34] *Id*.
[35] *Id*.
[36] Narseo Vallina-Rodriguez et al., *Disclosure: Covert Web-to-App Tracking via Localhost on Android*, https://localmess.github.io/.
[37] *Meta And Yandex Are De-Anonymizing Android Users' Web Browsing Identifiers*, *supra*, n.1.

CLASS ACTION COMPLAINT

36. Meta modified the Meta Pixel code and its Facebook and Instagram apps to take advantage of certain localhost ports for the purpose of surreptitiously collecting and transmitting to Meta's servers detailed, de-anonymized information about individuals' browsing activity on the internet. In essence, whenever an Android user visited a website with the Meta Pixel installed during the time period in which Meta engaged in the misconduct alleged herein, the Pixel would direct the user's browsing information (contained in the _fbp cookie) to be sent to a designated localhost port. Simultaneously, and because Meta had reconfigured them to do so, the Facebook and Instagram apps on the same device secretly "listened" to the designated localhost port for incoming data in order to receive the user's browsing information. The Facebook and Instagram apps would then transmit the user's browsing information along with persistent user identifiers (including, for example, Facebook ID, full name, email address, and other contact information) to Meta's servers, thereby linking the user's detailed browsing activity with their Facebook and Instagram accounts. Because this method of tracking does not rely on a user's browser to identify them, it effectively enables Meta to "link pseudonymous web identities with actual user identities, *even in private browsing modes*."[38]

37. Meta specifically targeted Android users through this process.[39] And over time, Meta *deliberately changed* the specific methods used to share user browsing information between browsers and the Facebook and Instagram apps—by changing the protocol or format by which such data was packaged, and by using different ports—to conceal Meta's true purposes. Indeed, for a period of months, Meta appears to have effectively deceived website owners and users alike of its unlawful data-collection scheme.

38. The technical flow of the process Meta implemented is summarized as follows:

- The user opens and logs into the Facebook or Instagram app on their Android device. The Facebook or Instagram app eventually creates a background service to listen for incoming traffic on a localhost port.

- The user opens their browser and visits a website on which the Meta Pixel is installed.

- The Meta Pixel script is loaded on the browser and sends the _fbp cookie to the Instagram or Facebook app via a localhost port. Over time, Meta employed different methods and protocols for transmitting the _fbp cookie to the Instagram or Facebook app—i.e., as an HTTP-based transmission, via the "Websocket" network protocol, and then via WebRTC technology.

---

[38] *Id.* (emphasis added).

[39] *Id.*

CLASS ACTION COMPLAINT

- The Meta Pixel script also sends the _fbp value in a request to https://www.facebook.com/tr along with other parameters such as page URL (dl), website and browser metadata, and the event type (e.g., PageView, AddToCart, Donate, Purchase).

- The Facebook or Instagram apps receives the _fbp cookie from the Meta Pixel script running on the browser and transmits it to the GraphQL endpoint (https://graph[.]facebook[.]com/graphql) along with other persistent user identifiers, linking users' fbp ID with their Facebook or Instagram account and all of the detailed personally identifying information contained therein.[40]



39.    To again distill this flow, Meta "insert[ed] key_fbp cookie content into" "a real-time peer-to-peer communication protocol commonly used for making audio or video calls in the browser," "caus[ing] the browser to send that data . . . to the Android local host, where the Facebook or Instagram app can read it

[40] *Id.*

and link it to the user."[41] This means Meta de-anonymized and linked Android users' browsing information to their Facebook and Instagram accounts in real time.

40.     According to the researchers who first uncovered Meta's deceptive practices, the Meta Pixel was "no longer sending any packets or requests to localhost," and "[t]he code responsible for sending the _fbp cookie ha[d] been almost completely removed," as of June 3, 2025.[42]

### C.     Neither Android Users Nor Websites Consent To Meta's Conduct

41.     Meta's cookie and privacy policies did not disclose that Meta is associating Android users' browsing information with their Facebook and Instagram accounts.

42.     Further, this association occurred even if users were "not logged in to Facebook [or] Instagram . . . on their mobile browsers," "use[] Incognito Mode," or "clear[] their cookies or other browsing data."[43] Thus, Meta's tracking "defeats Android's inter-process isolation and tracking protections based on partitioning, sandboxing, or clearing client-side state."[44]

43.     Notably, *even websites* were not aware of and do not consent to Meta's conduct. Again, what Meta did was in breach of Android security protocols. And, in fact, there have been "several complaints from puzzled website owners questioning why Meta Pixel communicates with localhost in Facebook developer forums by September 2024" with "[n]o official response from Meta representatives."[45] This suggests that website developers were unaware of what Meta was doing and did not consent to Meta's conduct, which illustrates how and why it would not be possible for an Android website user to consent to this conduct.

44.     Further, pursuant to its terms, Meta is only supposed to collect information that websites configure the Meta Pixel to collect. Therefore, a website operator can configure Meta's Pixel to transmit non-sensitive information, but theoretically prevent the Pixel from collecting sensitive or non-anonymous information. However, per the above breach of Android protocols by Meta, the Pixel collects de-anonymized information, *regardless* of any configuration settings by the respective website.

---

[41] *Id.*

[42] *Disclosure: Covert Web-to-App Tracking via Localhost on Android*, *supra*, n.36.

[43] *Id.*

[44] *Id.*

[45] *Id.*

CLASS ACTION COMPLAINT

45.     On top of this, Meta changed protocols between September 2024 and the present (from HTTP-based transmissions to the Websocket network protocol and finally to WebRTC technology) to make it harder for web developers to detect.[46]

46.     Compounding all of this, Google, which owns and develops the Android operating system, said "[Meta's] behavior violates the terms of service for its Play marketplace and the privacy expectations of Android users," specifically:

> The developers in this report [Meta] are using capabilities present in many browsers across iOS and Android in unintended ways that blatantly violate our security and privacy . . . . We've already implemented changes to mitigate these invasive techniques and have opened our own investigation and are directly in touch with the parties.

47.     In other words, not only does Google believe that Meta's practices are not consented to and violate Google's policies, Google believes the privacy breach to be so severe that Google is actively working to block further exploitations by Meta.

**III.     Meta's Use of Pixel-Derived Data for Advertising**

48.     Meta feeds the vast quantities of information obtained from the Meta Pixel and its social media platforms into its advertising systems, using such information to identify users and their personal characteristics, categorize them for Meta's business purposes, and target them with marketing messages from its advertising clients.

49.     Meta acknowledges this use of data. For example, Meta refers to the Meta Pixel as one of Meta's "Business Tools," and to websites with the Pixel embedded as "Partners." Meta explains in its Privacy Policy, among other places, that Meta uses "[i]nformation from Partners," expressly including information about "[w]ebsites you visit and cookie data, like through . . . the Meta Pixel," "to provide a personalized experience to [users], including ads."[47]

50.     One of the ways that Meta uses data obtained via the Pixel for advertising is by using it to define "audiences" customized for particular advertisers. Meta sells access to three types of tailored audiences. Advertisers can purchase access to "Core Audiences," composed of individuals with specified traits and characteristics. Meta assigns users to Core Audiences based on data it has learned or inferred

---

[46] *Id*.

[47] Meta Privacy Center, *Privacy Policy* (June 16, 2025), https://www.facebook.com/privacy/policy.

CLASS ACTION COMPLAINT

(including via data from Meta Pixels) about a range of their personal qualities, including users' location, age, gender, education, job title, connections to other Facebook users or pages, interests and hobbies, and behavior such as prior purchases and device usage.[48]

51.    Meta also sells access to "Custom Audiences," meaning the ability to reach "people who have already shown interest in [an advertiser's] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[49] Meta assigns users to Custom Audiences based on information from the Meta social media platform, and/or information the advertiser discloses about those users, such as email subscriber lists, and activity tracked on the advertiser's website(s), including via the Meta Pixel.[50]

52.    Meta also sells access to "Lookalike Audiences," a Meta feature that "leverages information such as demographics, interests and behaviors from your source audience [i.e., a Custom Audience tailored from the advertiser's records] to find new people who share similar qualities" with existing customers or Custom Audiences.[51] To generate Lookalike Audiences, Meta uses data it has obtained from across the web, including from Meta Pixels embedded in third-party websites that have no relationship with the advertiser requesting access to a Lookalike Audience.

53.    Accordingly, by knowingly and systematically employing a method for collecting users' detailed browsing information, and associating that information with their Facebook and Instagram account information, Meta substantially expanded the amount of non-anonymous, identifiable data reflecting users' behaviors across the internet. Such data could only serve to make Meta's data more robust and its advertising systems more valuable to advertisers.

## PLAINTIFF-SPECIFIC ALLEGATIONS

54.    Between September 2024 and the present, Plaintiff used a web browser on his Android mobile device (i.e., a mobile device that uses the Android operating system) to visit multiple websites where

---

[48] *Ad targeting*, *supra* n.6.

[49] *Id.*

[50] Meta Business Help Center, *Create a customer List Custom Audience*, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; *see also* Adespresso, *Facebook Custom Audiences 101: The Complete Guide for Marketers* (Mar. 23, 2021), https://adespresso.com/blog/facebook-ads-custom-audiences-guide/.

[51] Meta Business Help Center, *About lookalike audiences*, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

CLASS ACTION COMPLAINT

the Meta Pixel was installed, including but not limited to classmates.com, ebay.com, stockx.com, and ancestry.com. These websites are among those affected by the aforementioned practices.[52]

55.     When Plaintiff visited these websites on his Android mobile device via a web browser, he was located in California, had the Facebook app installed on his mobile device, and was logged into the Facebook app.

56.     Unbeknownst to Plaintiff, when Plaintiff visited these websites, Plaintiff's activities on these websites—*e.g.*, what webpages Plaintiff viewed, what things Plaintiff searched for, and the specific search terms Plaintiff used—and Facebook ID were collected by Meta in real time using the Meta Pixel. This occurred regardless of how the websites may or may not have configured the Pixel to impact what information was disclosed to Meta.

57.     Further, when Plaintiff visited these websites, unbeknownst to Plaintiff and in violation of Android security protocols, Meta deceptively accessed and collected Plaintiff's detailed browsing information in a manner that allowed Meta to tie that browsing information to the information he submitted on his Facebook profile (e.g., his name, address, email address, etc.) in real time, thus de-anonymizing and identifying Plaintiff and his browsing information in real time.

58.     Meta compiled all of this information to create a comprehensive profile of Plaintiff in its databases, which was used for advertising or other monetization purposes. And, based on Meta's invasive privacy practices described herein, Plaintiff's data became more valuable to Meta based on its identifiability.

59.     Neither Plaintiff nor the websites he visited were aware of Meta's conduct, nor did either Plaintiff or the websites he visited consent to Meta's conduct.

## CLASS ALLEGATIONS

60.     **Class:** Plaintiff seeks to represent a class of similarly situated individuals defined as follows:

> All persons in the United States with a Facebook or Instagram account who
> (i) have the Facebook or Instagram app installed on their Android device,
> (ii) used a web browser on their Android device to visit a website between
> September 1, 2024 and the present, where the Meta Pixel was installed, and
> (iii) whose browsing information was collected by Meta.

---

[52] *Disclosure: Covert Web-to-App Tracking via Localhost on Android*, *supra*, n.36 (search bar for websites where the Meta Pixel was installed that were affected by this practice).

CLASS ACTION COMPLAINT

61.    **California Subclass:** Plaintiff also seeks to represent a subclass of similarly situated individuals defined as follows:

> All persons in California with a Facebook or Instagram account who, while in California, (i) have the Facebook or Instagram app installed on their Android device, (ii) used a web browser on their Android device to visit a website between September 1, 2024 and the present, where the Meta Pixel was installed, and (iii) whose browsing information was collected by Meta.

62.    Excluded from the Class and California Subclass are Defendant, any controlled person of Defendant, as well as the officers and directors of Defendant and the immediate family members of any such person. Also excluded are any judge who may preside over this cause of action and the immediate family members of any such person. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

63.    **Numerosity**. While the exact numbers are unknown to Plaintiff at this time, the Class and California Subclass each consists of at least millions of individuals, making joinder impractical.

64.    **Commonality and Predominance**. Common questions of law and fact exist with regard to each claim and predominate over questions affecting only individual Class members. Questions common to the Class and California Subclass include but are not limited to:

a.    Whether Meta acted intentionally in violating Plaintiff's and class members' rights under the ECPA and the CIPA;

b.    Whether Meta's acts and practices alleged herein constitute egregious breaches of social norms;

c.    Whether Meta was unjustly enriched as a result of its violations of Plaintiff's and class members' rights;

d.    Whether Meta obtained express consent to its conduct;

e.    Whether Plaintiff and class members are entitled to damages under the ECPA, CIPA, or any other relevant statute; and

f.    Whether Meta should be enjoined from using, processing, or keeping (aside from any reasons concerning preservation for purposes of this litigation) Plaintiff's and class members' personal browsing-related information.

CLASS ACTION COMPLAINT

65. **Typicality**. Plaintiff's claims are typical of the claims of members of the Class and California Subclass in that Plaintiff, like all class members, has been injured by Meta's misconduct in collecting and de-anonymizing users' personal browsing-related information.

66. **Adequacy**. Plaintiff will fairly and adequately represent and protect the interests of the Class and California Subclass. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy-protection cases. Plaintiff does not have any interests antagonistic to those of the Class or California Subclass.

67. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Meta to comply with state and federal law. Moreover, because the amount of each individual class member's claim is small relative to the complexity of litigation, and because of Meta's financial resources, class members are unlikely to pursue legal redress individually for the violations detailed in this complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

68. **Injunctive Relief**. Plaintiff also satisfies the requirements for maintaining a class under Rule 23(b)(2). Defendant acted on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class or California Subclass as a whole.

69. **Particular Issues**. Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**Violation of the Electronic Communications Privacy Act**
**(On Behalf of the Class and California Subclass)**

70. Plaintiff incorporates and realleges the above factual allegations by reference.

71. The Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510, et seq. ("ECPA") prohibits the intentional interception, use, or disclosure of any wire, oral, or electronic communication. In relevant part, the ECPA prohibits any person from intentionally intercepting, endeavoring to intercept, or

CLASS ACTION COMPLAINT

procuring "any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

72. The ECPA protects both the sending and the receipt of communications.

73. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

74. The transmission of Plaintiff's and class members' website page visits, browsing and search information, and persistent identifiers each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

75. The transmission of this information between Plaintiff and class members, on the one hand, and each website with which they chose to exchange communications, on the other, are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

76. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

77. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

78. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication." 18 U.S.C. § 2510(5). The following instruments constitute "devices" within the meaning of the ECPA: (a) the Meta Pixel; (b) the code that enabled Meta to link browsing information with Facebook and Instagram profiles; and (c) any other tracking code or SDK used by Meta. Plaintiff and class members' interactions with each website are electronic communications under the ECPA.

79. By utilizing the methods described herein, Meta intentionally intercepted and/or endeavored to intercept the electronic communications of Plaintiff and class members in violation of 18 U.S.C. § 2511(1)(a).

CLASS ACTION COMPLAINT

80. Meta then used the intercepted communications for advertising or other monetization purposes. By intentionally using, or endeavoring to use, the contents of Plaintiff's and class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

81. Meta was not acting under the color of law to intercept Plaintiff's and class members' electronic communications.

82. Plaintiff and class members did not authorize Meta to acquire the content of their communications for purposes of invading Plaintiff's and class members' privacy. Plaintiff and class members had a reasonable expectation that Meta would not intercept their communications and sell their data for advertising or other monetization purposes without their knowledge or consent, particularly in the Android environment.

83. The websites Plaintiff and class members visited did not authorize or consent to Meta's conduct, given Meta's conduct constituted an abuse of Android security protocols and a violation of Google's terms.

84. As a result of every violation of the ECPA, on behalf of Plaintiff and class members, Plaintiff seeks all remedies available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act**
**(On Behalf of the California Subclass)**

85. Plaintiff incorporates and realleges the above factual allegations by reference.

86. The California Invasion of Privacy Act (CIPA) is codified at Cal. Penal Code §§ 630–638. The Act begins with its statement of purpose:

> The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. The Legislature by this chapter intends to protect the right of privacy of the people of this state.

CLASS ACTION COMPLAINT

Cal. Penal Code § 630 ("Legislative declaration and intent").

**Wiretapping – California Penal Code § 631**

87.    California Penal Code § 631(a) provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars.

88.    Speaker of the California Assembly, Jesse Unruh, who introduced CIPA, urged that the law "represents an important advance in California law protecting the inherent rights of our citizens to privacy in their personal affairs. It is far stronger than the laws of many states in this field, and much tougher than the proposed federal eavesdropping legislation." He further emphasized that the law would act as "a powerful deterrent to those who wiretap illegally for profit."

89.    Meta is a "person" within the meaning of Cal. Penal Code § 631.

90.    Each of the following items constitutes a "machine," "instrument," or "contrivance," under CIPA, and even if they do not, Meta's deliberate and purposeful scheme to intercept communications falls under the broad catch-all category of "any other manner":

a.    The Meta Pixel;

b.    The code that enabled Meta to link browsing information with Facebook and Instagram profiles;

c.    Any other tracking code or SDK used by Meta;

d.    Plaintiff's and class members' browsers; and

e.    Plaintiff's and class members' Android devices.

91.    Meta willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents the electronic communications of Plaintiff and California Subclass Members, on the one hand, and the websites at issue, on the other, while

the electronic communications were in transit or were being sent from or received at any place within California.

92.     Meta used those intercepted communications, including but not limited to de-anonymizing and identifying Plaintiff and California Subclass members through the signals sent on the Android communication channels, using all of this information to build comprehensive audiences for advertisers, and selling access to those audiences to interested advertisers for a profit.

93.     Neither Plaintiff nor California Subclass members nor website operators provided their prior consent to Meta's intentional interception, reading, learning, recording, collection, de-anonymization, and usage of Plaintiff's and California Subclass members' electronic communications. Nor could they have done so, because Meta acted surreptitiously, such that even website operators did not know or consent to Meta's actions.

94.     The wiretapping of Plaintiff and California Subclass members occurred in California, where Plaintiff and California Subclass members accessed the websites, where the Meta Pixel was loaded on Plaintiff's and California Subclass members' browsers, where Meta used the Android communication channels to de-anonymize and identify Plaintiff and California Subclass members, and where Meta routed Plaintiff's and California Subclass members' electronic communications to Meta's servers, which were located in California where Meta is headquartered.

95.     Plaintiff and California Subclass members have suffered loss by reason of these violations including, but not limited to, violations of their rights to privacy and loss of value in their personally identifiable information.

96.     Pursuant to California Penal Code § 637.2, Plaintiff and California Subclass members have been injured by Meta's violations of California Penal Code § 631, and each seeks damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**Eavesdropping of Confidential Communications – California Penal Code § 632**

97.     California Penal Code § 632(a) provides, in pertinent part:

A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio,

CLASS ACTION COMPLAINT

shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation.

98.    A "confidential communication" is any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto. *See* Cal. Penal Code § 632(c).

99.    Meta is a "person" within the meaning of Cal. Penal Code § 632.

100.    Each of the following items constitutes "an electronic amplifying or recording device" under CIPA:

　　a.    The Meta Pixel;

　　b.    The code that enabled Meta to link browsing information with Facebook and Instagram profiles;

　　c.    Any other tracking code or SDK used by Meta;

　　d.    Plaintiff's and class members' browsers; and

　　e.    Plaintiff's and class members' Android devices.

101.    Through the use of the Meta Pixel, Meta intentionally eavesdropped upon confidential communications between and Plaintiff and California Subclass members, on the one hand, and each website with which they chose to exchange confidential communications, on the other, and further caused the contents of Plaintiff's and California Subclass members' confidential communications with those websites to be automatically recorded and transmitted to Meta, without the knowledge or consent of Plaintiff and class members.

102.    Plaintiff and California Subclass members had a reasonable expectation that their communications with websites would remain confidential vis-à-vis Meta and not be recorded or disclosed thereto.

103.    At no time did Plaintiff or California Subclass members consent, expressly or otherwise, to Meta's recording or eavesdropping on their confidential communications with websites. Neither Meta's nor any website's privacy policy provided clear, explicit, or adequate notice that such recording or disclosure would occur.

CLASS ACTION COMPLAINT

104. Plaintiff and California Subclass members have suffered loss by reason of these violations including, but not limited to, violations of their rights to privacy and loss of value in their personally identifiable information.

105. Pursuant to California Penal Code § 637.2, Plaintiff and California Subclass members have been injured by Meta's violations of California Penal Code § 632, and each seeks damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**Manufacture of an Eavesdropping Device – California Penal Code § 635**

106. California Penal Code § 635(a) provides, in pertinent part:

> Every person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another . . . shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500).

107. Each of the Meta Pixel and the code Meta uses to tie users' communications with websites to their identities is a "device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another."

108. Meta manufactured, assembled, advertised or offered for sale, and possessed these devices.

109. Meta's use of these devices on the various websites that Plaintiff and California Subclass members visited caused Plaintiff and California Subclass members real and concrete harm, including but not limited to Meta's unjust enrichment and the loss of control of their personal information. *See Yoon v. Meta Platforms, Inc.*, 2024 WL 5264041, at *7 (N.D. Cal. Dec. 30, 2024).

110. Neither Plaintiff nor California Subclass members nor website operators provided their prior consent to Defendant's manufacturing or use of these wiretapping devices.

111. Pursuant to California Penal Code § 637.2, Plaintiff and California Subclass members have been injured by Meta's violations of California Penal Code § 635, and each seeks damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**Use of Pen Register – California Penal Code § 638.51**

112. California Penal Code § 638.51(a) prohibits any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

CLASS ACTION COMPLAINT

113.    California Penal Code § 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

114.    California Penal Code § 638.50(c) defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

115.    In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information. For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

116.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. Courts have repeatedly recognized that in the internet era, pen registers and trap and trace devices can take the form of software and, as a result, private companies and persons have the ability gather the same electronic information as law enforcement. The California legislature does not limit its prohibition on installing pen registers to law enforcement.

117.    Meta's code, as described above, constitutes a "pen register" because it is "a device or process that records . . . addressing[] or signaling information"—such as Plaintiff's and California Subclass members' IP addresses—from the electronic communications transmitted by their Android devices. To the extent the URLs and email addresses intercepted by Meta's code do not constitute contents of communications, they constitute routing, addressing, or signaling data.

118.    Alternatively, Meta's code constitutes a "trap and trace device" because it is a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or

CLASS ACTION COMPLAINT

electronic communication"—such as the Plaintiff and California Subclass members who are communicating with websites.

119. At all relevant times, Meta installed or used the pen register and/or trap and trace device on various websites and Android communication channels, enabling Meta to de-anonymize and identify Plaintiff and California Subclass members by tying their browsing information to their Facebook and Instagram profiles.

120. Meta was not authorized by any court order to use a pen register and/or trap and trace device to record Plaintiff's and California Subclass members' routing, addressing, or signaling information. Nor did Plaintiff, California Subclass members, or website operators provide their prior consent to Meta's installation or use of a pen register and/or trap and trace device.

121. Meta uses pen registers and/or trap and trace devices to collect such information en masse from Plaintiff and California Subclass members as a non-party to their communications with websites, for the express purpose of creating comprehensive profiles of Plaintiff and California Subclass members and facilitating the tracking of all of their online activity and making that information available to third parties. The interception of data is done for the express purpose of personally identifying Plaintiff and California Subclass members and using that information to link Plaintiff and California Subclass members' online activities to the profiles Meta maintains of them. The data Meta collects and aggregates through its pen registers and/or trap and trace devices constitutes "unique fingerprinting," thereby providing unique information normally within the domain of law enforcement officers with a warrant.

122. Pursuant to California Penal Code § 637.2, Plaintiff and California Subclass members have been injured by Meta's violations of California Penal Code § 638.51(a), and each seeks damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**THIRD CAUSE OF ACTION**
**Invasion of Privacy Under the California Constitution**
**(On Behalf of the California Subclass)**

123. Plaintiff incorporates and realleges the above factual allegations by reference.

124. Article I, section 1 of the California Constitution provides that "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty,

CLASS ACTION COMPLAINT

acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy*." The phrase "and privacy" was added by the "Privacy Initiative" adopted by California voters in 1972.

125. The addition of the phrase "and privacy" occurred after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Proposition 11 was intended to curb businesses' control over the unauthorized collection and use of peoples' personal information, as the ballot argument stated:

> The right of privacy is the right to be left alone. . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.

126. This amended constitutional provision addresses the concern over accelerating encroachment on personal freedom and security caused by increasing surveillance and data collection activity in contemporary society. Its proponents meant to afford individuals more measures of protection against this most modern threat to personal privacy:

> Computerization of records makes it possible to create "cradle-to-grave" profiles of every American. At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.

In recognizing these privacy rights, the California Constitution provides insight into and serves to define the nature of the reasonable expectation of privacy of an objectively reasonable California resident. In contravention to the California Constitution and the reasonable expectations of privacy of California residents, Meta "stockpil[es] unnecessary information about [California Subclass members] and [] misus[es] information gathered for one purpose in order to serve other purposes," creating "cradle-to-grave" profiles of California Subclass members.

127. Plaintiff and California Subclass members maintain a reasonable expectation of privacy in the conduct of their lives, including their internet browsing activities and in their electronic communications and exchange of personal information. The reality of modern life increasingly requires that much of our daily activities are conducted online—Plaintiff and California Subclass members have no practical choice or ability but to conduct their daily lives substantially in the digital world, connected to the internet. The

CLASS ACTION COMPLAINT

necessary engagement with the digital world makes Plaintiff's and California Subclass members' private lives susceptible to unlawful observation and recording, capable of yielding a comprehensive and intrusive chronicle of Plaintiff's and California Subclass members' lives. If Plaintiff and California Subclass members cannot have a reasonable expectation of privacy in the conduct of their lives online and the digital transmission of their personal information, they can have no reasonable expectation of privacy for virtually any facet of their lives.

128. By conducting such widespread surveillance, including through the interception, collection, tracking, and compilation of their internet activity, Meta intentionally invaded Plaintiff's and California Subclass members' privacy rights, as well as intruded upon Plaintiff's and California Subclass members' seclusion.

129. Plaintiff and California Subclass members did not and could not authorize Meta to intercept data on every aspect of their lives and activities.

130. The conduct as described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

a. Meta engages in widespread data collection and interception of Plaintiff's and California Subclass members' internet activity, including their communications with websites, thereby learning intimate details of their daily lives based on the massive amount of information collected about them;

b. Meta abused a communication channel in violation of Google's policies to connect website information and Plaintiff's and California Subclass members' Facebook and Instagram accounts, thus de-anonymizing and identifying Plaintiff and class members and tying their browsing information with their identities;

c. Meta combined the information collected on websites with users' identities for advertising or other monetization purposes; and

d. Meta sells access or discloses this information, which contains the data improperly collected about Plaintiff and class members, to an unknown number of advertisers who choose to advertise on the Facebook ecosystem, which likewise violates Plaintiff's and California Subclass members' common law right to privacy and the control of their personal information.

CLASS ACTION COMPLAINT

131.    Meta was enriched through this collection of data because users' browsing information became more valuable when Meta exploited the Android communication channels to tie browsing information to users' identities.

132.    Meta's amassing of electronic information reflecting all aspects of Plaintiff's and California Subclass members' lives into profiles for future or present use is in and of itself a violation of their right to privacy in light of the serious risk these profiles pose to their autonomy.

133.    The California Constitution created an inalienable right to be free from pervasive electronic surveillance; Plaintiff and California Subclass members are under no obligation to "opt out" of such violations of their constitutional privacy rights to stop Meta's intrusions into their daily lives—that right inheres automatically for every California Subclass member.

134.    The right to privacy in California's constitution creates a right of action for California residents against private entities such as Meta. Meta lacks a legitimate business interest in stockpiling and compiling the personal information of Plaintiff and California Subclass members.

135.    Plaintiff and California Subclass members have been damaged by Meta's invasion of their privacy and are entitled to just compensation and injunctive relief.

### FOURTH CAUSE OF ACTION
#### Intrusion Upon Seclusion
#### (On Behalf of the Class and California Subclass)

136.    Plaintiff incorporates and realleges the above factual allegations by reference.

137.    California common law on intrusion upon seclusion is applicable to all members of the Class and California Subclass.

138.    A plaintiff asserting a claim for intrusion upon seclusion must plead (1) intrusion into a private place, conversation, or matter; (2) in a manner highly offensive to a reasonable person.

139.    Plaintiff and class members maintain a reasonable expectation of privacy in the conduct of their lives, including their internet browsing activities and in their electronic communications and exchange of personal information. The reality of modern life increasingly requires that much of our daily activities are conducted online—Plaintiff and class members have no practical choice or ability but to conduct their daily lives substantially in the digital world, connected to the internet. The necessary engagement with the digital world makes Plaintiff's and class members' private lives susceptible to unlawful observation and recording

CLASS ACTION COMPLAINT

that is capable of yielding a comprehensive and intrusive chronicle of Plaintiff's and class members' lives. If Plaintiff and class members cannot have a reasonable expectation of privacy in the conduct of their lives online and the digital transmission of their personal information, they can have no reasonable expectation of privacy for virtually any facet of their lives.

140. By conducting such widespread surveillance, including through the interception, collection, tracking and compilation of their internet activity, Meta intentionally violated Plaintiff's and class members' reasonable expectation of privacy, and accordingly intruded upon Plaintiff's and class members' seclusion.

141. Plaintiff and class members did not and could not authorize Meta to intercept data on every aspect of their lives and activities.

142. The conduct as described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

a. Meta engages in widespread data collection and interception of Plaintiff's and class members' internet activity, including their communications with websites, thereby learning intimate details of their daily lives based on the massive amount of information collected about them;

b. Meta abused a communication channel in violation of Google's policies to connect website information and Plaintiff's and class members' Facebook and Instagram accounts, thus de-anonymizing and identifying Plaintiff and class members and tying their browsing information with their identities;

c. Meta combined the information collected on websites with users' identities for advertising purposes; and

d. Meta sells access or discloses this information, which contains the data improperly collected about Plaintiff and class members, to an unknown number of advertisers who choose to advertise on the Facebook ecosystem, which likewise violates Plaintiff's and class members' common law right to privacy and the control of their personal information.

143. Meta was enriched through this collection of data because users' browsing information became more valuable when Meta exploited the Android communication channels to tie browsing information to users' identities.

CLASS ACTION COMPLAINT

144. Meta's amassing of electronic information reflecting all aspects of Plaintiff's and class members' lives into profiles for future or present use is in and of itself a violation of their right to privacy in light of the serious risk these profiles pose to their autonomy.

145. Accordingly, Plaintiff and class members have been damaged by Meta's intrusion upon their seclusion and are entitled to all relief available under common law.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of the Class and California Subclass)**

146. Plaintiff incorporates and realleges the above factual allegations by reference.

147. California common law on unjust enrichment is applicable to all members of the Class and California Subclass.

148. Meta has wrongfully and unlawfully trafficked in the Plaintiff's and class members' personal information and other personal data without their consent for substantial profits.

149. Plaintiff's and class members' personal information and data have conferred an economic benefit on Meta, in that Meta improperly used Android communication channels to link Facebook and Instagram accounts with users' browsing activity, rendering such browsing activity de-anonymized and identifiable, and more valuable to advertisers. Meta also conducted this activity without consent.

150. Meta has been unjustly enriched at the expense of Plaintiff and class members, and the company has unjustly retained the benefits of their unlawful and wrongful conduct.

151. The remedies available to Plaintiff and class members are inadequate to compensate them for the injuries they have suffered as a result of Meta's conduct. Thus, it would be inequitable and unjust for Meta to be permitted to retain any of the unlawful proceeds resulting from its unlawful and wrongful conduct.

152. Plaintiff and class members did not provide authorization for the use of their information, nor did Meta provide them with control over its use. Plaintiff's and class members' personal information, including information about their internet browsing activities, carries financial value. Meta was unjustly enriched by aggregating and monetizing that information to obtain financial gain.

153. The portion of Meta's revenue attributable to Meta's wrongful conduct described herein is susceptible of measurement and can be determined through discovery.

CLASS ACTION COMPLAINT

154.    Meta was aware of the benefit conferred by Plaintiff and class members. Meta acted in conscious disregard of the rights of Plaintiff and class members, deliberately exploiting the Android communication channels to link browsing information to Facebook and Instagram profiles. Accordingly, Meta should be required to disgorge all profit obtained therefrom to deter Meta and others from committing the same unlawful actions again.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a.    Certify the proposed Class and California Subclass pursuant to Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiff as the representative of the Class and California Subclass, and designating the undersigned as Class Counsel;

b.    Permanently restrain Meta, and its officers, agents, servants, employees and attorneys, from unlawfully using the Meta Pixel to track, obtain, and use Plaintiff's and class members' personal information;

c.    Award compensatory damages, including statutory damages where available, to Plaintiff and class members against Meta for all damages sustained as a result of Meta's wrongdoing, in an amount to be proven at trial, including interest thereon;

d.    Award punitive damages on the causes of action that allow for them and in an amount that will deter Meta and others from like conduct;

e.    Award equitable relief including restitution and disgorgement of all revenues, earnings, profits, and ill-gotten gains that Meta obtained as a result of its unlawful and wrongful conduct, in an amount to be proven at trial;

f.    Enter judgment in favor of Plaintiff and class members against Meta;

g.    Award attorneys' fees and costs, as allowed by law including, but not limited to, California Code of Civil Procedure section 1021.5;

h.    Award pre-judgment and post-judgment interest, as provided by law; and

i.    Award such other, further, and different relief as the Court deems proper under the circumstances.

CLASS ACTION COMPLAINT

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues so triable.

Dated:  July 2, 2025                              Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP


By: */s/ Michael W. Sobol*
    Michael W. Sobol (SBN 19485)
    msobol@lchb.com
    Michael K. Sheen (SBN 288284)
    msheen@lchb.com
    Amelia A. Haselkorn (SBN 339633)
    ahaselkorn@lchb.com
    LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
    275 Battery Street, 29th Floor
    San Francisco, CA  94111-3339
    Telephone:  415.956.1000
    Facsimile:  415.956.1008

    Douglas I. Cuthbertson (*pro hac vice*
    forthcoming)
    dcuthbertson@lchb.com
    LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
    250 Hudson Street, 8th Floor
    New York, NY 10013
    Telephone: 212.355.9500
    Facsimile:  212.355.9592

    *Attorneys for Plaintiff*

CLASS ACTION COMPLAINT